**UNITED STATES of America,**

v.

**Denise Corttessia ABDULLAH.**

**Crim. No. JFM–94–0422.**

United States District Court, D. Maryland.

Nov. 3, 1995.

the law of the case. *See* Fourth Circuit I.O.P. 36.6.

Lynne A. Battaglia, United States Attorney for the District of Maryland, Andrea L. Smith, and Susan M. Ringler, Assistant United States Attorneys, Baltimore, Maryland, for government.

Harold I. Glaser, and John S. Deros, Baltimore, Maryland, for defendant.

## SENTENCING MEMORANDUM AND ORDER

MALETZ, Senior District Judge.

### I. *Sentencing Facts*

Mrs. Abdullah is married to Sahib Abdullah, who, along with Corey Woodfolk, pled guilty to violation of 21 U.S.C. § 841, for his direction of the "Strong as Steel" heroin distribution ring between 1990 and January of 1994. The ring trafficked in heroin in Baltimore through the use of shops, which were used to sell the drugs, and stash houses, which were used to warehouse the drugs. Mrs. Abdullah was employed by Amtrak in Union Station, Washington, D.C., during the life of the conspiracy. She was convicted under 21 U.S.C. § 846 of being a member of the conspiracy.

"Strong as Steel" was a large-scale drug conspiracy. At trial, the government produced credible evidence, through Givette Hogan, the fourth ranking member of the conspiracy, that "Strong As Steel" sold literally tens of thousands of "dime bags" of heroin, which sold for $10 a piece, during the course of the conspiracy. Givette Hogan also testified that roughly thirty percent of the sales were in $25 dollar bags which contained an undisclosed amount of heroin. The government also established through the testimony of Timothy Shird that each "dime bag" contained roughly ⅜ths of a gram of heroin.

"Strong as Steel" was an extremely violent organization. At trial, Givette Hogan testified that two members of "Strong as Steel" shot and killed a rival heroin dealer during March of 1991. In addition, Hogan testified that she participated in the beating of others and that she was herself often beaten when her cash receipts did not correspond to the quantity of heroin which she had been given to sell.

During 1992, as "Strong as Steel" found itself in a cash-flow bind, the organization began to conduct home invasions of those suspected of being rival drug dealers and other assorted robberies. Timothy Shird testified that Sahib Abdullah helped to plan an unconsummated robbery of the Union Station Amtrak receipts. Nathaniel Gantt testified that he and others impersonated police officers to gain entry into the homes of rival drug dealers before robbing them. On one occasion, when Gantt and his associates mistakenly seized armed possession of the home of a cab driver, they tortured the occupants with a heated knife until satisfied that they did not actually have a stash of drugs or money.

Against this background, the court finds no basis whatever in the record for attributing any of the violence involving "Strong as

Steel" to Mrs. Abdullah. Indeed, there was not a scintilla of testimony linking her to any of the robberies which actually occurred. In fact, Shird, Gantt and Hogan each testified that Mrs. Abdullah was *not* involved in any of the violence, planning of violence or present during the discussion of violence in which they participated.

The only testimony which tied Mrs. Abdullah to any act of violence was second or third-hand information having little probative value. First, Sahib Abdullah informed the other members of "Strong As Steel" that he had learned the layout and schedule of the Amtrak station from his wife. Such testimony falls far short of establishing that Mrs. Abdullah should have reasonably foreseen that her husband would conspire to rob her workplace.[1] Second, Gantt testified that Doncarlos Williams, another member of "Strong as Steel," indicated that Mrs. Abdullah was attempting to help gain entry for Gantt and Williams into the home of a rival drug dealer.

That information is not a reliable basis to infer Mrs. Abdullah's participation in the planning of violence. First, Gantt testified that he never spoke to Mrs. Abdullah about the plan, nor heard her speak on that subject. Second, the home invasion in question was the botched operation which targeted not a rival drug dealer but rather the unfortunate cab driver. As such, the court finds that no credible evidence has been advanced to tie Mrs. Abdullah to any of the acts of violence of "Strong as Steel."

Mrs. Abdullah, however, did participate in the conspiracy in two manners. First, on at least one occasion in 1991, she delivered seventeen bundles of heroin, each bundle containing at least fifty "dime bags" of heroin, to a stash house operated by Givette Hogan. The court finds that those seventeen bundles contained approximately 318.75 grams of heroin.[2] Second, Mrs. Abdullah operated the Sharper Edge Barber Shop as a conduit for laundering the proceeds of "Strong as Steel"'s drug profits. Although Mrs. Abdullah contends that all of the money deposited in her bank account were the proceeds of business at the Sharper Edge, at least $107,090 was deposited in 1991, prior to the Sharper Edge opening on February 5, 1992. The $107,090 represents the proceeds of the sale of approximately four kilograms of heroin. In total, at least $286,503 of the money which Mrs. Abdullah deposited into the account of the Sharper Edge represents drug profits which she attempted to launder. These profits represent the sale of approximately ten kilograms of heroin during the three year period from 1991–1993.

## II. *Criminal History*

On April 18, 1988, Mrs. Abdullah was convicted in the Circuit Court for Montgomery County, Maryland with violation of Article 27, Section 286(a)(5) of the Annotated Code of Maryland, maintenance of a common nuisance. Section 286(a)(5) makes it a crime for any person to:

> [K]eep or maintain any common nuisance which means any dwelling house, apartment, building ... or any place whatever which is resorted to by drug abusers for purposes of illegally administering controlled dangerous substances or which is used for the illegal manufacture, distribu-

---

1. The court finds the assertion by the government that the violence can be fairly attributed to Mrs. Abdullah all the more troubling given the fate of those who admittedly committed the acts of violence. Givette Hogan pled guilty to reduced charges in state court, had a lengthy sentence suspended and was placed on probation; Timothy Shird was charged only with the acts of violence, and not membership in the underlying drug conspiracy, and testified that he faced 130 months incarceration less credit for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, and a substantial assistance downward departure, *see* U.S.S.G. § 5K1.1; and Nathaniel Gantt, who admitted to participation in torture, impersonation of a police officer, and robbery of stores within a shopping mall which he was hired to protect as a security guard, was sentenced in state court, at the United States Attorney's request, to five years of unsupervised probation with no geographic restrictions.

2. The court rejects the testimony of Angela Cheatham, who testified that she often saw Mrs. Abdullah at the stash houses. This testimony not only conflicts with that of Givette Hogan, who ran the stash houses, but also was given by a witness who was an ongoing drug addict and whose demeanor and drug habits rendered her devoid of any credibility.

tion, dispensing, storage or concealment of controlled dangerous substances or controlled paraphernalia. . . .

This crime is, in all pertinent respects, equivalent to 21 U.S.C. § 856, which was adopted as a floor amendment to the Federal Anti-Drug Act of 1986, *see United States v. Sturmoski*, 971 F.2d 452, 461–62 (10th Cir.1992) (collecting legislative history), and is a predicate drug offense for the purposes of 21 U.S.C. § 841(b). *Id.* Mrs. Abdullah's particular offense conduct on that occasion was maintaining a home in which 30 gallons of liquid PCP, drug paraphernalia and a loaded revolver were stored. The drugs and gun apparently belonged to her then boyfriend, Ronald McClary.

Mrs. Abdullah was sentenced to two years in prison for her prior conviction, all but fifteen months of which was suspended. The resulting nine months of incarceration count as two points on her criminal history score. *See* U.S.S.G. § 4A1.1(b). In addition, she was sentenced to two years of probation following her release from prison. Therefore, her current offense was committed during her probation, earning an additional two points on her criminal history score. *See* U.S.S.G. § 4A1.1(d). Finally, the current offense was committed within two years of her release from imprisonment, earning one more criminal history point. *See* U.S.S.G. § 4A1.1(e) (only one criminal history point is added for a crime within two years of release if two points are already being assessed for committing a crime while on probation).

There is no merit to Mrs. Abdullah's claim that imposing criminal history points under both § 4A1.1(d) and § 4A1.1(e) constitutes impermissible double counting. The guidelines explicitly provide for how the two provisions are to be applied in conjunction with each other. This precise argument was rejected by the Fourth Circuit in *United States v. Crawford*, 18 F.3d 1173, 1180 (4th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 171, 130 L.Ed.2d 107 (1994). Thus, Mrs. Abdullah has five criminal history points, placing her in Criminal History Category III.

III. *Sentencing Guidelines*

■ Although the sentence imposed in this case is required by certain mandatory minimums, it is incumbent upon the court to first undertake the appropriate calculations of the sentence under the Sentencing Guidelines. *United States v. Pierson*, 53 F.3d 62, 66 (4th Cir.1995). This guidelines sentence would be imposed absent a mandatory minimum sentence required by the statute of conviction or if the guidelines sentence were greater than the statutory minimum. *United States v. Irvin*, 2 F.3d 72, 78 (4th Cir.1993). Against this background, proper application of the guidelines requires analysis of both modes of Mrs. Abdullah's participation in the "Strong as Steel" conspiracy.

Had Mrs. Abdullah's sole involvement in the conspiracy been the delivery of the seventeen bundles of heroin in 1991, application of the guidelines would have been relatively straightforward. Illustration (c)(5) of application note 2 of section 1B1.3 defining relevant conduct states:

Defendant O knows about her boyfriend's ongoing drug-trafficking activity, but agrees to participate on only one occasion by making a delivery for him at his request when he was ill. Defendant O is accountable under subsection (a)(1)(A) for the drug quantity involved on that one occasion. Defendant O is not accountable for the drug sales made by her boyfriend because those sales were not in furtherance of her jointly undertaken criminal activity.

Thus, but for her money laundering, Mrs. Abdullah would only be responsible for the approximately 318 grams of heroin which she delivered in 1991. Under § 2D1.1 of the guidelines, that quantity of heroin would produce an offense level of 26, which when combined with a criminal history category of III would yield a sentencing range of 78–97 months.

■ However, Mrs. Abdullah's principal activity encompassed the laundering of over $200,000 in drug proceeds. For that reason, based on the entire record, the court believes Mrs. Abdullah should have been prosecuted for money laundering, *see* 18 U.S.C. § 1956, with the heroin she actually delivered consid-

ered as relevant conduct at sentencing, rather than conspiracy to distribute heroin. Even under Mrs. Abdullah's actual offense of conviction, conspiracy to distribute heroin, pursuant to application note 1 to section 1B1.2 of the Sentencing Guidelines (Applicable Guidelines), this court has the discretion to apply the guidelines based upon "the nature of the offense conduct charged in the count of which the defendant was convicted." The money laundering conducted by Mrs. Abdullah is most accurately sentenced under § 2S1.1, which specifically applies to money laundering.[3] A sentence imposed under § 2S1.1 is not to be grouped with one imposed under § 2D1.1. *See* U.S.S.G. § 3D1.2. Instead, the two types of offense conduct are to be considered separately and then a total sentence imposed under U.S.S.G. § 3D1.3.

▇ Under § 2S1.1, Mrs. Abdullah's base offense level is 20. A three level upward adjustment is required under § 2S1.1(b)(1), because the defendant knew that the funds laundered were the proceeds of drug activity.[4] An additional two level upward adjustment would be appropriate because between $200,000 and $350,000 were laundered. The resulting offense level is twenty-five.

Combining the offense levels derived from § 2D1.1 (*e.g.* drug distribution) and § 2S1.1 (*e.g.* money laundering) under U.S.S.G. § 3D1.4 yields a total offense level of twenty eight. There are no other appropriate adjustments to the offense level. Therefore, under the Sentencing Guidelines, Mrs. Abdullah's sentencing range is between 97–121 months. However, that sentence will not be imposed due to the operation of the mandatory minimum sentence discussed below.

## IV. *Mandatory Minimum Sentence*

▇ As set out above, under the Sentencing Guidelines, the court has discretion to impose a sentence which reflects the nature of the offense conduct. However, that discretion is not applicable here in view of the fact that Mrs. Abdullah was convicted under 21 U.S.C. § 846. Section 846 specifies that,

Any person who ... conspires to commit an offense defined in this subchapter [21 U.S.C. § 841 *et. seq.*] *shall* be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the ... conspiracy.

(emphasis added). *See United States v. Irvin,* 2 F.3d 72, 77 (4th Cir.1993) (Section 846 intended to "synchronize the penalties for conspiracies and their underlying offenses."), *cert. denied,* — U.S. —, 114 S.Ct. 1086, 127 L.Ed.2d 401 (1994).

Therefore, Mrs. Abdullah is subject to the penalties described in 21 U.S.C. § 841(b). Section 841(b)(1)(A)(i) requires that a minimum of a ten-year sentence be imposed for any person convicted of a violation involving, "1 kilogram or more of a mixture or substance containing a detectable amount of heroin." Moreover, section 841(b)(1)(A) goes on to require that, "If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years...."

Under the relevant criteria, Mrs. Abdullah is responsible for more than one kilogram of heroin for her role in the "Strong as Steel" drug conspiracy. First, she is responsible for the heroin which she actually delivered. Second, under the "reasonable foreseeability" test, she is responsible for all heroin which was a part of the conspiracy which was reasonably foreseeable to her. The Fourth Circuit has instructed that

in order to apply § 841(b) properly, a district court must first apply the principles of *Pinkerton* [*v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)] as set forth in the relevant conduct section of the sentencing guidelines, U.S.S.G. § 1B1.3, to determine the quantity of narcotics reasonably foreseeable to each co-

---

3. The court believes that the fact that this case was not brought under 18 U.S.C. § 1956 (money laundering) seems to be part of a pattern of overzealousness which the United States Attorney's office has displayed in regard to this prosecution.

4. Given Mrs. Abdullah's actual delivery of drugs in 1991, the court finds that she clearly knew that the unexplained funds which she was laundering for her husband were the proceeds of drug activity.

conspirator within the scope of his agreement. If that amount satisfies the quantity indicated in § 841(b), the district court must impose the mandatory minimum sentence absent a higher sentencing range resulting from application of the sentencing guidelines.

*Irvin,* 2 F.3d at 78.

This court holds that the amount of heroin reasonably foreseeable to Mrs. Abdullah was well more than the one kilogram necessary to trigger the mandatory minimum provisions of section 841(b)(1)(A). According to the trial testimony, the $286,502 which Mrs. Abdullah laundered on behalf of "Strong as Steel" represents the proceeds of approximately 10.7 kilograms of heroin. This money laundering clearly was designed to facilitate the underlying drug crimes. Therefore, the mandatory penalty provided by section 841(b)(1)(A) applies to Mrs. Abdullah.

Prior to trial, the government filed a notice of enhancement under 21 U.S.C. § 851 informing Mrs. Abdullah of the government's intent to seek an enhanced penalty based upon her 1988 Maryland conviction for maintaining a common nuisance, *i.e.* drug house. Mrs. Abdullah has not challenged the validity of that prior conviction. *See* 21 U.S.C. § 851(c). As discussed above, that prior conviction is properly counted as a "felony drug offense." Therefore, this court is required to apply the enhanced penalty provided in section 841(B)(1)(A) of twenty years.

### V. *Conclusion*

This court is constrained by the statutory mandatory minimums to impose the twenty year sentence required by section 841(b)(1)(A). Mrs. Abdullah was a participant in the "Strong as Steel" drug conspiracy, and she participated after she had already been convicted and jailed for a drug offense. Twice Mrs. Abdullah made the decision to become involved with the criminal activity of the men in her life. She bears culpability for the crimes in which she participated.

However, the sentence *required* to satisfy the mandatory minimum not only doubles the sentence which would be imposed under the Sentencing Guidelines, it exceeds any sense of proportion of Mrs. Abdullah's culpability. The sentence imposed demonstrates the wholescale transfer of discretion from the judiciary to the United States Attorney and her assistants which has been accomplished by the creation of draconian mandatory minimum sentences. Nevertheless, this court is required to apply the law.

The court hereby imposes the mandatory minimum twenty year term of imprisonment. In addition, the court imposes the mandatory minimum ten year term of supervised release to follow Mrs. Abdullah's term of incarceration. The mandatory $50 special assessment is also imposed. The guidelines also recommend that a fine between $17,500—$4,000,000 be imposed. However, the court does have discretion in this matter and in view of Mrs. Abdullah's current financial condition, no fine will be imposed.